No.: **21-7384**

ORIGINAL

In The
**Supreme Court of the United States**
_____ Term, 2022

FILED
MAR 1 0 2022
OFFICE OF THE CLERK
SUPREME COURT, U.S.

**JOSEPH LAUE** — Appellant

v.

**STATE OF LOUISIANA** — Appellee(s)

**On Petition for a Writ of Certiorari to**

**LOUISIANA SUPREME COURT**

Joseph Laue #520423
MPWY/Wal-4
La. State Penitentiary
Angola, LA 70712

*PREPARED BY:*
David Constance #304580
Offender Counsel Substitute III
Main Prison Legal Aid Office
Criminal Litigation Team
La. State Penitentiary
Angola, LA 70712

## QUESTION(S) PRESENTED

1.  Reasonable jurists would determine that the jury's verdict as to Count One should be reversed as the evidence against Mr. Laue was constitutionally insufficient. No rational trier of fact, viewing the evidence in the light most favorable to the State could have found Mr. Laue guilty beyond a reasonable doubt.

2.  Reasonable jurists would determine that the jury's verdict as to Count One should be reversed as the evidence against Mr. Laue failed to exclude every reasonable hypothesis of innocence as required by LSA-R.S. 15:438 and Louisiana and federal jurisprudence. Therefore, no rational trier of fact, viewing the evidence in the light most favorable to the State could have found Mr. Laue guilty beyond a reasonable doubt.

## LIST OF PARTIES

[  ]    All parties appear in the caption of the case on the cover page.

[ X ]    All parties **do not** appear in the caption of the case on the cover page.  A list of all parties to the proceeding in the court whose judgment is the subject of this petition is as follows.


District Attorney's Office
Parish of St. Tammany
701 N. Columbia St.
Covington, LA  70433

Jeff Landry - Louisiana Attorney General
P.O. Box 94005
Baton Rouge, LA  70804-9005

Darrel Vannoy, Warden
Louisiana State Penitentiary
General Delivery
Angola, LA  70712

## TABLE OF CONTENTS: <span style="float:right">**Page**</span>

QUESTION(S) PRESENTED

LIST OF PARTIES

INDEX TO APPENDICES.................................................................................iii

TABLE OF AUTHORITIES................................................................................iv

OPINIONS...........................................................................................................1

JURISDICTION....................................................................................................2

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED.......................1

NOTICE OF PRO-SE FILING..............................................................................1

REQUEST FOR JUDICIAL NOTICE.....................................................................1

REASONS FOR GRANTING THE PETITION........................................................2

STATEMENT OF THE CASE AND ACTION OF TRIAL COURT............................2

STATEMENT OF THE FACTS..............................................................................3

STANDARD OF REVIEW AND APPLICABLE LAW..............................................15

    **Proof by circumstantial evidence – LSA-R.S. 15:438**.......................................15

    **Application of the Jackson standard – General Precepts**..................................17

    **Application of the Jackson standard in cases involving circumstantial evidence**...........19

LAW AND ARGUMENT.......................................................................................20

ISSUE NO. 1 AND 2...........................................................................................20

    **Reasonable jurists would determine that the jury's verdict as to Count One should be reversed as the evidence against Mr. Laue was constitutionally insufficient. No rational trier of fact, viewing the evidence in the light most favorable to the State could have found Mr. Laue guilty beyond a reasonable doubt; and Reasonable jurists would determine that the jury's verdict as to Count One should be reversed as the evidence against Mr. Laue failed to exclude every reasonable hypothesis of innocence as required by LSA-R.S. 15:438 and Louisiana and federal jurisprudence. Therefore, no rational trier of fact, viewing the evidence in the light most favorable to the State could have found Mr. Laue guilty beyond a reasonable doubt**.........................................20

CONCLUSION.....................................................................................................23

PROOF OF SERVICE............................................................................................25

PROOF OF SERVICE............................................................................................1

## INDEX TO APPENDICES AND EXHIBITS

APPENDIX A       Original Brief by Counsel;

APPENDIX B       Ruling First Circuit Court of Appeal;

APPENDIX C       Writ Application to the Louisiana Supreme Court;

APPENDIX D       Ruling Louisiana Supreme Court.

## TABLE OF AUTHORITIES:                                              **Page**

## U.S. CONSTITUTION:

Fifth, Sixth and Fourteenth Amendments to the United States Constitution.....................................1
Fourteenth Amendment to the United States Constitution........................................................19
Sixth and Fourteenth Amendments to the United States Constitution.............................................1

## FEDERAL CASES:

Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)...........................................1
Winship.......................................................................................................17, 18
Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)........................passim
Thompson v. Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960)................................18

## STATUTORY PROVISIONS:

Art. 804 (A)..................................................................................................16
La.C.Cr.P. Art. 821..........................................................................................16, 19
La.C.Cr.P. Art. 821 B..........................................................................................16
LSA-R.S. 14:30.1 (A)(3)...................................................................................15, 20, 24
LSA-R.S. 15:438............................................................1, 3, 15, 16, 19, 20, 22
LSA-R.S. 14:30(A)(3)...........................................................................................2
Rule X, § (b) and (c)...........................................................................................2

## STATE CASES:

State v. Abercrombie, 375 So.2d 1170, 1177-8 (La. 1979)......................................................17
State v. Allen, 440 So.2d 1330, 1333 (La. 1983)...............................................................17
State v. Captville, 448 So.2d 676, 678 (La. 1984).............................................................17
State v. Chambers, 2016 La. App. LEXIS 2513 (La. App. 5th Cir. 2016)..........................................23
State v. Chambers, 933 So.2d 200 (La. App. 3rd Cir. 2006).....................................................23
State v. Chism, 436 So.2d 464 (La. 1983)......................................................................19
State v. Cohen 315 So.3d 202 (La. 2021).......................................................................23
State v. Davis, 637 So.2d 1012, 1020 (La. 5/23/94)............................................................17
State v. Dykes, 440 So.2d 88, 93 (La. 1983)...................................................................17
State v. Eason, 2019 La. App. LEXIS 2374 (La. App. 1st Cir. 12/27/19).........................3, 16, 22
State v. Hano, 938 So.2d 181 (La. App. 1st Cir. 2006)......................................................15, 21
State v. HLJ, 6 So.3d 997 (La. App. 3rd Cir. 2009)..........................................................3, 19
State v. Main Motors, Inc., 383 So.2d 327, 328 (La. 1979)....................................................17

IN THE
SUPREME COURT OF THE UNITED STATES
PETITION FOR WRIT OF CERTIORARI

Appellant respectfully prays that a writ of certiorari issue to review the judgment below.

**OPINIONS BELOW**

[ ]    For cases from **federal courts**:

The opinion of the United States Court of Appeals appears at Appendix _____ to the petition and is

[ ]    reported at _____; or,
[ ]    has been designated for publication but is not yet reported; or,
[ ]    is unpublished.

The opinion of the United States district court appears at Appendix _____ to the petition and is

[ ]    reported at _____; or,
[ ]    has been designated for publication but is not yet reported; or,
[ ]    is unpublished.

[ X ]    For cases from **state courts**:

The opinion of the highest state court to review the merits appears at Appendix "D" to the petition and is the Louisiana Supreme Court at 327 So.3d 933 (La. 11/17/21).

[ ]    reported at _____; or,
[X]    has been designated for publication but is not yet reported; or,
[ ]    is unpublished.

The opinion of the First Circuit Court of Appeal appears at Appendix "B" to the petition and is

[X]    reported at 362 So.3d 267 (La. App. 1st Cir. 12/30/20); or,
[ ]    has been designated for publication but is not yet reported; or,
[ ]    is unpublished.

## JURISDICTION

[ ]    For cases from **federal courts**:

The date on which the United States Court of Appeals decided my case was _____.

[ ]    No petition for rehearing was timely filed in my case.

[ ]    A timely petition for rehearing was denied by the United States Court of Appeals on the following date: _____, and a copy of the order denying rehearing appears at Appendix _____.

[ ]    An extension of time to file the petition for a writ of certiorari was granted to and including _____ (date) on _____ (date) in Application No. ____.

The jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1).

[ X ]  For cases from **state courts**:

The date on which the highest state court decided my case was April 20, 2021. A copy of that decision appears at Appendix "⁰".

[ ]    A timely petition for rehearing was thereafter denied on the following date: _____, and a copy of the order denying rehearing appears at Appendix _____.

[ ]    An extension of time to file the petition for a writ of certiorari was granted to and including _____ (date) on _____ (date) in Application No. ____.

The jurisdiction of this Court is invoked under 28 U.S.C. § 1257(a).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

This conviction was obtained in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Specifically, Mr. Laue was denied the right to a fair and impartial trial due to the fact that the jury's verdict as to Count One should be reversed as the evidence against Mr. Laue was constitutionally insufficient. No rational trier of fact, viewing the evidence in the light most favorable to the State could have found Mr. Laue guilty beyond a reasonable doubt.

Furthermore, reasonable jurists would determine that the jury's verdict as to Count One should be reversed as the evidence against Mr. Laue failed to exclude every reasonable hypothesis of innocence as required by LSA-R.S. 15:438 and Louisiana and federal jurisprudence. Therefore, no rational trier of fact, viewing the evidence in the light most favorable to the State could have found Mr. Laue guilty beyond a reasonable doubt.

## NOTICE OF PRO-SE FILING

Mr. Laue requests that this Honorable Court view these Claims in accordance with the rulings of *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); Mr. Laue is a layman of the law and untrained in the ways of filings and proceedings of formal pleadings in this Court.

## REQUEST FOR JUDICIAL NOTICE

Mr. Laue would like this court to note that the Law Library located at the Main Prison Complex of the Louisiana State Penitentiary, Angola, Louisiana has limited access to the Offenders who are currently housed at this institution due to Covid restrictions. Since April 1, 2020, access to the Law Library for the Offenders have been "sporadic" at best. Movement at the Louisiana State Penitentiary has also been *very limited* since the onset of the Covid Pandemic.

Currently, Offenders who are housed on the East Yard are not allowed access to Offenders who are housed on the West Yard. Currently, Mr. Laue is housed in Walnut-4, which is on the West Yard, and the Offender Counsel Substitute who is assigned to assist him is housed in Ash-4, which is on the East

Yard. Simply put, Mr. Laue is not allowed in the Law Library when the Counsel Substitutes from the East Yard are working, and the Counsel Substitutes from the East Yard are not allowed to visit their clients on the West Yard. Simply put, Offenders who are housed on the East Yard are only allowed access to the Law Library on Monday, Wednesday and Friday; and the Offenders who are housed on the West Yard are only allowed access to the Law Library on Tuesday, Thursday and Saturday. *No exceptions.*

## REASONS FOR GRANTING THE PETITION

In accordance with this Court's *Rule X, § (b) and (c)*, Mr. Laue presents for his reasons for granting this writ application that:

Review on a Writ of Certiorari is not a matter of right, but of judicial discretion. A petition for a Writ of Certiorari will be granted only for compelling reasons. The following, although neither controlling nor fully measuring the Court's discretion, indicate the character of the reasons the Court considers.

A state court of last resort (Louisiana Supreme Court) has decided an important federal question in a way that conflicts with the decision of another state court of last resort or of a United States Court of Appeals.

A state court or a United States Court of Appeals has decided an important question of federal law that has not been, but should be, settled by this Court, or has decided an important federal question in a way that conflicts with relevant decisions of this Court.

## STATEMENT OF THE CASE AND ACTION OF TRIAL COURT

On September 26, 2019, Joseph Laue (hereinafter referred to as Mr. Laue), was convicted of the Second Degree Murder of Albert Marant (Albert) by Distribution of a Controlled Dangerous Substance directly causing death, in violation of LSA-RS. 14:30(A)(3). He was also convicted of three drug charges, Distribution of Heroin, Possession With Intent to Distribute Heroin, and Possession of

Suboxone (Vol. II, pp. 364-371).

The jury's verdict on the Second Degree Murder charge was necessarily based *entirely* on circumstantial evidence. It was undisputed at trial that no one accompanied Albert when he purchased the Heroin claimed to have caused his death and no video or audio evidence was introduced at trial directly demonstrating who supplied it.

Louisiana statutory law (LSA-R.S. 15:438) and jurisprudence (*State v. Eason*, 2019 La. App. LEXIS 2374 (La. App. 1st Cir. 12/27/19), dictate that in order to convict a criminal defendant based on circumstantial evidence it "… must exclude every reasonable hypothesis of innocence." See: LSA-R.S. 15:438 and *Eason*, p. 8.

Credibility determinations are *almost* always the province of the factfinder. However, the jury's determination that the State proved beyond a reasonable doubt that Mr. Laue caused Albert's death by Distribution of a Controlled Dangerous Substance was *unreasonable, irrational, and contrary to* the tenets of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); and, *State v. Mussall*, 523 So.2d 1305 (La. 1988). See also: *State v. HIJ*, 6SDD 997 (La. App. 3rd Cir. 2009).

## STATEMENT OF THE FACTS

On August 25, 2015, Albert died at home. The St. Tammany Parish Coroner's Office classified the "*manner*" of his death and an "*accident*."[1] The *cause* of his death was perhaps Heroin toxicity[2] or perhaps multiple toxicity.[3]

Whichever the medical cause of death, there is no question that Albert had a long-running battle with drug addiction. This was attested by his mother, Newanna (Bonnie) Marant (Rec.Vol. IV, pp. 786-787), his sister, Amanda Marant (Amanda; Rec.Vol. IV, pp. 796-799) and his then girlfriend, Alexandra

---

1 Rec. Vol. V, p. 966.
2 Michael Defatta, MD, (Dr. Defatta) St. Tammany Parish's Chief Deputy Coroner, using an odd phraseology, declared himself "fine" with the autopsy report prepared by Dr. Cacucci pronouncing Heroin Toxicity as the medical cause of Mr. Marant's death (Rec.Vol. V, p. 979). What evidentiary standard "fine" means is unknown.
3 John Lizarraga, a forensic toxicologist formally (during the time surrounding Mr. Marant's death) with the St. Tammany Parish on the other hand testified he could not rule out Multiple Toxicity (Rec.Vol. V. p. 944).

(Ali) Verdin Hendricks (Ms. Hendricks; Rec. Vol. V, pp. 817-19). Drug use appears to have been integral to Albert's family's lifestyle. Notwithstanding Albert's struggles with Heroin addiction, Amanda arranged to smoke marijuana with him on the day of his death (Rec. Vol. VI, pp. 794-5).[4]

Ms. Hendricks was also a Heroin addict:

Q:   So, at the time of Albert's death he was struggling with Heroin addiction?
A:   We both were.
Q:   You both were?
A:   Yes. (*Id.*, p. 817).

Albert would procure and share Heroin with Ms. Hendricks:

Q:   So, would it be typical for – at this particular time about how much money were you spending everyday on Heroin?
A:   To be honest, I would be lying if I told you. I really don't remember because every day was different, you know, depending on how much money we had that day, or you know, the paycheck for the week, or whatever the case may have been. I am not one-hundred percent sure, but at least $40.00 a day because we had to share. *Albert always divvied it up and he always did that. He took care of me* (*Id.*, p. 824. *Emphasis added*).

In addition to the testimonial evidence concerning Albert's long-standing drug addiction, there was physical evidence of it on autopsy. Dr. Defatta testified to the "track marks" on Albert's arm with:

A:   There is one thing that stood out really in this in that there was a fairly long scar in what we call the left antecubital space of the arm and that's in the crook of the arm right here. It's a fairly long scar, and along with that scar were little, small lesions, scabs, indicative of and very consistent with previous IV drug abuse. This is what we call a track mark.
Q:   Okay. Doctor, I'm going to show you what has previously been admitted as State's Exhibit 4-W and Defendant's Exhibit 23. Is that Exhibit consistent with the kind of markings you were just describing?
A:   Yes. It is.
Q:   That is something that you would classify as a track mark?
A:   Yes. It is.

Dr. Defatta acknowledged on cross-examination that Albert's track marks were indicative of a

---

4   This is not mentioned to tarnish either Albert or Amanda. Rather, it is illustrative of the pull that illicit drugs exerted on Albert, an extremely important point when considering the argument, *infra*. It also bears on just how much money Albert had and hence what quantity of drugs he could afford at the time of his death. Ms. Hendricks testified that she had to loan Albert $20.00 on the day of his death because he was "short" of the $50.00 he needed for the Heroin (Rec. Vol. IV, p. 824). Amanda testified that Albert said he would pick up marijuana after work. "I asked him if he could get some marijuana for us. He agreed and said when he got off work, he would pick it up (Rec. Vol. V, p. 794). There was no testimony about how the marijuana was going to be paid for.

history of drug use:

Q:    Is that indicative of essentially a history of injecting something?

A:    Yes, sir.

Q:    Over a period of time?

A:    Yes, sir. (*Id*, p. 973).

On the day of his death, Albert went to see Ms. Hendricks at her mother's house to borrow money

for the day's Heroin purchase:

A:    Well, my Mom had just boughten (sic) a house. So, I was helping my mother move from one house to another, talking to Albert throughout the day, because he was at work. He had a rough day at work. He wasn't feeling good because he didn't have nothing that day. I remember we were $20.00 short. So, I asked my Mom to borrow $20.00 and he came over and stopped by his sister's car and got $20.00 from me. Then he said I love you and I will see you when I get home. And that was the last time I talked to him (Rec.Vol. IV, p. 824).

Unsurprisingly, Albert's history of drug abuse began a history of interactions with drug dealers.

According to Ms. Hendricks:

Q:    And you mentioned that originally, he mostly dealt with Matt and Bob and Joe was relatively a late comer to the matter?

A:    Yes.

Q:    But, he stayed in touch with Matt and Bob, didn't he?

A:    I think Bob got busted the morning that Albert passed.

Q:    But not Matt?

A:    No. Not Matt.

Q:    He stayed in touch with him?

A:    Yes.

Q:    In fact, during the day when y'all were texting back and forth he mentioned Matt at least once.

A:    Yes. (*E.g.* pp. 846-7. Matt was/is Matt Eagle, according to the text messages discussed *infra*).

Matt Eagle remained a prominent contact for Albert. Det. Jeremy Bertucci, of the Slidell Police

Department (SPD) was accepted as an expert in digital forensics (Rec.Vol. VI, p. 1064). He performed

a digital forensic examination of Albert's phone (*Id.*, p. 1073). Two numbers were associated with Matt

Eagle (*Id.*, 1076). Matt had 49 text messages and 73 calls on Albert's contact list at phone number one

(*Id.*, p. 1077), and 104 text messages and 16 calls associated with phone number two (*Ibid.*).

The text messages and phone history between Albert and Matt, particularly on August 25, and 25, 2015 is critical to understanding the context of Mr. Laue's appeal. According to Det. Bertucci:

Q:    All right. So, one of the things you were able to access from the phone was the top contacts, correct?

A:    Yes, sir.

Q:    One of the top contacts as mentioned right here is a fellow by the name of Matt, right?

A:    That's what that appears.

Q:    That is the number right over here, ***-8340, right?

A:    Yes, sir.

Q:    The only top contact without a name is the one that's directly under that, ***-7088, right?

A:    Yes, sir.

Q:    Again, mine is not in color, I just printed it out, but this is from your report. This text – now all of these were from the phone of Albert Marant; is that correct? To the best of your knowledge, the decedent in this case. Were you informed of that?

A:    I am not one-hundred percent sure on that.

Q:    All right. So, there is a phone from ***-7088, can you see that?

A:    Yes.

Q:    And the person is texting, yo, it Matt, what up, right?

A:    Yes, sir.

Q:    Response is Matt who, and the response is Eagle, right?

A:    Yes.

Q:    Here again we have an exchange from that same phone number, ***-7088, right?

A:    Yes, sir.

Q:    And the person whose phone this is is making the comment, you change your phone number too damn much, right?

A:    Yes, sir.

Q:    I think you said this was ascending order, the previous message, Matt, save my number, LOL, right?

A:    Yes, sir.

Q:    So, the next would be, the response would be, I did you change your number too damn much?

A:    Yes, sir.

Q:    So, the phone number that Matt is using is this ***-7088, correct?

A:    Yes, sir.

Q:    I am looking for that page, but again that was a frequent contact, correct, ***-7088 that we began this whole process?

A:    Yes.

Q:    So, now we know that number is also Matt, correct?

A:    That's what we can assume.

Q:    All right. So, we are back to the top contacts and Ms. McGinness mentioned earlier about what were these contacts, messages, phone calls?

A:    Yes, sir.

Q:    So, we see that Matt is down here with forty-nine (49) messages and seventy-three (73) calls, correct?

A:    Yes, sir.

Q:    But Matt also unidentified has another one-hundred-and-four (104) and another sixteen (16) calls, correct?

A:    That one does. Yes, sir.

Q:    So, if you combine those two, Matt moves up the list, right?

A:    Yes. He should. It is also important to note that this is information, user imputted data that phone. So, the number labeled Matt is him labeling that number Matt.

Q:    correct, but we have no reason to believe he would enter the wrong name, right?

A:    No. (Rec.Vol. VI, pp. 1075-8).[5]

The forensic examination of Albert's phone shows a flurry of activity on the evening before and the date of his death. Because of the importance of this activity to Mr. Laue's appeal, Det. Bertucci's testimony is reproduced at length:

Q:    All right. This is stating that it is 8:24 at twenty-two (22). So, if I understand correctly it would be 8:24 at 17:20?

A:    Yes, sir.

Q:    All right. So 5:20pm on the 24th, correct?

A:    Yes, sir.

Q:    All right. And this is the out-going text, can you get anything?

A:    Yes, sir.

Q:    All right. I believe we are going in ascending order, I wanted to ask you about – here we go, the timing on this one, well not that's not it either. Right here we have Matt stating I might have extra when I come back, if I do you want me to holler at you and he says, ye, right? Here we go, this is what I am trying to get to, this time, says 8:25 00:21, because the zero zero would normally be, I guess midnight?

A:    Yes, sir.

Q:    So, instead of zero zero, it would be what?

A:    Subtracting from twenty-four, so it would be –

---

5    The redaction of the first three digits of the phone numbers under discussion was done by counsel to protect privacy interests. They are not redacted on the record.

Q:    7:04, is that how it works?

A:    Yes, sir. So, it would be 7:21 –

Q:    Okay. So, the evening of the 24th. Okay. And at that point the sender, owner of the phone says, put my name on it. I want it. Right. Can you meet me off Spanish Trail. All right. So, now we are at 8:25, 15:36, so it would be 10:36?

A:    Yes, sir.

Q:    So, that would be in the morning of the 25th, correct?

A:    Yes, sir.

Q:    All right. Matt is saying, sorry about last night, right? The gentleman whose phone it is, thanks for blowing me off. Okay. All right, so at 10:36, in the morning of the 25th, correct?

A:    Yes, sir.

Q:    We have Matt saying, I will be making another run today if you want to go. It is flame as hell, too, right? Now, this right here, you have a B.E., then right above you have an S.T. and this comes after that, is it fair to say that some how this kind of got looped, it is supposed to be best?

A:    What is the time on that next message? Can you pull the paper down some?

Q:    15:36:28, 15:36:31?

A:    Yes. You know, I would have to speculate to it, but the –

Q:    It follows though, correct? Best I have had in two years?

A:    Correct. Sometimes, you know, if they accidentally send in mid-type, they are typing and they actually send it and finish and send it, that's what I would be able to tell from that.

Q:    So, from this we can say that Matt is telling the owner of the phone at 10:30 – something, that sh**t it got had everyone lit up. See that right here?

A:    Yes, sir.

Q:    But I will text when I am getting ready or text me. I won't be off by that time and he expresses his displeasure, I won't crowd up the record with that. What time you get off? I'm not sure probably around four. Again, this is the outgoing. This is self, so the owner of the phone?

A:    Yes, sir.

Q:    Matt says, I might still be around. I will text you. See if my ride will wait, owner of the phone, you got the money to put up? I am only going to have maybe fifty, damn, looks like I am shit out of luck; is that correct?

A:    Yes, sir.

Q:    This would be at what time, 15:46, that would be 10:46 in the morning?

A:    Yes, sir.

Q:    Then we have Matt, I don't know, I am waiting for someone to bring me their money. Let me know when you're off. Now they're maybe not leaving until four, but again, this is at 17:45 would be 12:45 correct?

A:    Correct. Yes, sir.

Q:      So, little after midday?

A:      Yes, sir.

Q:      All right. Also in your report was the phones, if you remember Ms. McGinness was pointing out, I believe she was pointing out these calls here that were on the 25th. It is difficult enough to do in military, but subtracting five hours, I apologize, so 15:42.

A:      Yes, sir. 15:42, which would be 3:42pm.

Q:      Okay.

A:      Yes, sir.

Q:      So, at 3:42, he made this call which is the one that Ms. McGinness was referencing, correct?

A:      Yes, sir.

Q:      All right. But at 3:46, we have the last call he actually took place in that we know of, and that's with Matt, correct?

A:      That's what it appears to be. Yes, sir.

Q:      And this shows it was about a seven minute conversation?

A:      Yes, sir.

Q:      And that would be at about 3:46?

A:      Yes, sir.

Q:      All right. He missed a call. Says in, so that means he missed a call from Matt, right?

A:      Yes, sir.

Q:      Then at 12:26?

A:      Yes, sir.

Q:      He missed another call from Matt?

A:      Yes, sir.

Q:      At approximately 2:00 in the afternoon?

A:      Yes, sir, 2:04.

Q:      He missed another call from Matt. Just a few minutes later 2:13, in the afternoon he missed another call, no this is outgoing so he called Matt back, is that what that would be, outgoing?

A:      Yes, sir.

Q:      All right. And that shows it was only a thirty-three (33) second, about the length of time to leave a message maybe, right?

A:      Possibly.

Q:      Then we have at, would this be 2:15?

A:      Yes.

Q:      Missed another call from Matt. This would be 3:46, am I correct in the time adjustment?

A:      Yes.

Q:      And that's the time that he finally speaks to Matt from the seven minutes.

A:      Yes, sir.

Q:     Correct. Then after this conversation, this seven minute conversation with Matt at appropriately 3:46, it is kind of blurry, but we have a whole lot of missed call, correct?

A:     Yes, sir.

Q:     For the rest of that day until the final entry of the phone, correct?

A:     Correct.

Q:     I will go back to that page we were just discussing, all right. We have these later phone calls with Matt, but the time that's the last call the last mention of Joe as far as call log is concerned, that would be, am I correct, that's 3:25pm.

A:     3:25. Yes, sir.

Q:     All right. And the time that's given over there is that the beginning of the call?

A:     That's typically when the call is connected.

Q:     So, this call would have been connected, at 3:46 and last, based upon this, until appropriately 3:53; is that correct?

A:     Yes. (*Id*, Rec. Vol. VI, pp. 1075-78).[6]

Notwithstanding the digital forensic evidence indicating that Mr. Marant was trying to "score"

Heroin from Matt both the night before and the day of his death, the SPD did nothing to investigate it.

SPD narcotics officer, Charles Esque, a twenty-two-year (22) law enforcement veteran (eleven with

SPD: Rec.Vol. VI, p. 1085) assigned to investigate both Mr. Laue *and* Albert's death testified:

Q:     When you checked through the phone, did you notice that the last phone conversation with Mr. Albert Marant had before his death was with Matt Eagle?

A:     No, sir.

Q:     You didn't notice that? Did you notice there were a number of calls throughout the day on that last day of his life with Matt Eagle?

A:     No, sir.

Q:     Did you review the text messages in the phone?

A:     That ones for Mr. Laue. Yes, sir.

Q:     But did you review text messages in the phone? I think you took pictures of them, correct?

A:     The ones where he communicated with someone by the name Joe.

Q:     So, you only looked at the text messages with Joe?

A:     Yes, sir.

Q:     You weren't interested in the text messages about buying Heroin from Matt Eagle on the same day?

A:     I don't recall even seeing those.

Q:     Do you recall text messages between him and Matt Eagle where Matt is talking about

_____
6   The profanity in this excerpt was edited by Mr. Laue's appellate counsel.

making a run to New Orleans, getting the best stuff that's flame as hell, best I have had in two years. That s\*\*t got everyone lit up. You don't remember seeing texts like that?

A:   No, sir.

Q:   Do your remember a text between Mr. Marant and Matt Eagle where he tells Matt Eagle to meet him on Old Spanish Trail?

A:   No, sir. (Rec.Vol. VI, pp. 1125-6).

This investigative failure *may* be explained by any or all of: (1) the SPD's Narcotics Unit being shorthanded,[7] (2) a hyper-vigilante focus on Mr. Laue,[8] (3) Off. Esque's inexperience in investigation of overdose cases as murder.[9]

Because of, or concomitant with the above, the SPD never identified *any* witness who claimed to be present when Albert bought Heroin on the day he died. Bonnie never claimed to be present, Amber never claimed to be present and Ms. Hendricks never claimed to be present. No witness, documents or forensic analysis links any Heroin that Albert consumed on August 25, 2015 with Lt. Col. McGee.

Although Ms. Hendricks testified that Heroin that she and Albert allegedly got from Mr. Laue the day before he died was "really strong" (Rec.Vol. IV, p. 823), there is no indication that any qualitative analysis was done to determine if it was especially pure, the State made no attempt to show that the Heroin collected at Albert's house had any "signature" characteristics of strength or purity consistent with Ms. Hendricks' testimony.[10]

The scene processing at Albert's home alarmingly was lackluster considering his death. It was processed by former SPD Crime Scene Technician Jeanne Kaufman. She exercised the sole authority to determine: (1) what to look for (Rec.Vol. V., p. 899); (2) what to photograph, *Ibid.*, and (3) what

---

7  Off. Esque acknowledged that the SPD Narcotics Unit was shorthanded (Rec.Vol. VI, p. 1125). His supervisor, SPD Sergeant Dennis Bush testified that he and Off. Esque were working the entire SPD Narcotics Division with a combined caseload of one hundred cases (Rec.Vol. V, pp. 1010-1).

8  In addition to failing to investigate Matt, a suspect more/equally as promising as Mr. Laue (Rec.Vol. VI, pp. 1125-6), Off. Esque engaged Ms. Hendricks as a documented Confidential Informant (CI) for the sole purpose of investigating Mr. Laue (*Id*, p. 1131).

9  Off. Esque has handled approximately seven suspected overdose cases and only this case where he claimed he was able to link a suspect to a decedent (Rec.Vol. VI, pp. 1085-86)/

10  The testimony of St. Tammany Parish Sheriff's Office (STPSO) Crime Lab analysis Jill Jennings (Rec.Vol. VI, pp. 1052-56) was cursory at best and did not address this issue/possibility. Neither did that of Brittany Graham another drug analyst with the STPSO Crime Lab.

evidence to collect at the scene, *Ibid*. However, she did not: (1) interview anyone in Albert's house to determine what may be relevant to processing the scene (Rec.Vol. V, p. 898), (2) look for evidence of any other "narcotics, pills or opiates of any sort" beyond what was "right there on the scene."[11] What Ms. Kaufman did do was collect: (1) .71 grams of prepackaged weight Heroin from the bathroom where Albert was found;[12] (2) a syringe, with Heroin inside, with a prepackaged weight of 3.10 grams from the same place (*Id.*, pp. 904-5).

Ms. Kaufman's "method" for preparing the powder for transport for analysis was:

Q:    Did you place the powder into the glassine envelope?
A:    Yes, sir.
Q:    Nobody else?
A:    No, sir.
Q:    How exactly do you do that?
A:    Well, from that scenario, I would have picked up the card and tilted it and dumped the suspected Heroin into the glassine envelope.
Q:    Did you use a brush or anything or just kind of dumped it in?
A:    No, sir. I just dumped it in.
Q:    Did you send the card off to the lab?
A:    No, sir.
Q:    So, any powder or residue that was left on the card would not have gone to the lab?
A:    No, sir.
Q:    Was the card itself taken into evidence?
A:    No, sir.
Q:    The green –
A:    I don't recall (*Id.*, p. 911).

Albert needed $50.00 for that day's Heroin.[13] However, the amount of Heroin found at his mother's house that day he died clearly had a value in excess of that. As noted above, Ms. Hendricks testified that Albert would buy for both of them – "because we had to share." Clearly, the excess amount was not her separate "stash." Ms. Hendricks had also testified that:

---

11  *Id.*, p. 900. For reasons discussed, *infra*, this was/is a significant omission.
12  *Id.*, p. 904. The weights are significant for reasons discussed, *infra*.
13  According to Ms. Hendricks: "I am not one-hundred percent sure, but at least *$40.00 a day* because we had to share. Albert always divvied it up and he always did all that. He took care of me" (Rec.Vol. VI, p. 824 (*emphasis added*).

Q:    When you gave him, I didn't catch and I apologize what was it, y'all were $20.00 short about?

A:    Getting the Heroin.

Q:    Okay. I though you were late on a bill?

A:    No.

Q:    Do you recall telling Detective Esque that you gave him $50.00?

A:    No.

Q:    You're pretty sure you told him twenty (20)?

A:    Yes.

Q:    *Would the $20.00 have been what was necessary to make $50.00?*

A:    Yes (Rec. Vol. V, p. 846 – *Emphasis added*).

The trial evidence demonstrated what the street price of Heroin was in 2015. Damien Hughes (Mr.

Hughes) testified that he *resold* Heroin obtained from Mr. Laue to Paul Fagan (Rec. Vol. V, pp. 1015,

1022)[14] on September 8, 2015 (*Id.*, p. 986). The price he sold it for was $30.00. According to Mr.

Hughes:

Q:    My understanding is that Mr. Fagan gave you $30.00 for that Heroin; is that correct?

A:    Yes, sir.

Q:    That was the full price? He didn't still owe you any more money?

A:    *No. He didn't owe me any more money. No* (*Id.*, pp. 992-3 (*Emphasis added*).

Off. Esque established that Heroin purchased by Mr. Fagan from Mr. Hughes was seized in its

entirety:

Q:    All right. You stated in your report that this was approximately a transaction involving $30.00 worth of Heroin?

A:    Correct.

Q:    The one with – the September incident?

A:    Yes, sir.

Q:    Now, when you take something into evidence I presume it would not be a normal procedure for you to take any of it out, you will keep it all together in evidence, correct?

A:    Yes, sir.

Q:    In other words, if you seize a sample, you seize some Heroin, you're not going to take part of it out and submit the rest? You will submit it all into evidence?

A:    Yes, sir.

Q:    All. Right that would be what you did here?

---

14 He is also referred to as Sean Fagan.

A:      Yes, sir (Rec. Vol. VI, pp. 1135-6).

The Heroin was seized by Sgt. Bush who verified it as .17 grams (Rec. Vol. V, pp. 1021-2):

Q:      Okay. In the reports, of the Heroin seized at the scene there is mention of .17 grams of
        Heroin found on the ground, would that be the Heroin that we just talked about that was
        dropped by Mr. Fagan?
A:      If it pertains to this case. Yes.
Q:      Okay. There was no other Heroin? That's the only one it could be?
A:      On this case, correct. That's the only thing (*Id.*, pp. 1038-9).

On November 5, 2015, Sgt. Bush and Off. Esque arrested Mr. Laue and Paul Bethe (Mr. Bethe) on

Heroin charges (*Id.*, p. 1024). Mr. Laue was the alleged seller and Mr. Bethe the purchaser. According

to Off. Esque:

Q:      You dealt with Mr. Bethe?
A:      Correct.
Q:      And I believe you put in your report that it was you retrieved from his $40.00?
A:      Correct.
Q:      You put in your report you believed this was for a sale of $40.00 worth of Heroin?
A:      Correct.
Q:      Based on your experience that's seems to match the facts?
A:      Yes

And:

Q:      The $40.00 was consistent with the amount and the fact that they were making a transaction.
        Mr. Laue had the Heroin in his hand that he dropped on the ground and Mr. Bethe had the
        $40.00 in his hand to purchase the Heroin. I can't recall exactly, but I believed they had
        communication in his phone about wanting to get a $40.00 from him, I believe (*Id.*, p.
        1143).

According to Sgt. Bush, the amount of Heroin seized was .3 grams:

Q:      Okay. Did you engage in searching Mr. Bethe?
A:      No, sir.
Q:      That would be Detective Esque?
A:      Correct.
Q:      When you searched Mr. Laue, did you find any additional suspected Heroin?
A:      No.
Q:      So, here again, are you the one that picked up the Heroin from the ground in that case?
A:      Yes.
Q:      And so in the reports when it refers to .3 grams of Heroin from the scene, that would be that one
        packet you saw him drop, correct?
A:      Yes.

Q:    Nothing else?

A:    Correct.

Q:    There was no other Heroin?

A:    No, sir (Rec.Vol. V, p. 1040).

The chart below is instructive. The amount of Heroin found in proximity of Albert's body *cannot* be accounted for by a $50.00 purchase – even without the syringe Ms. Kaufman took when she processed the scene.

| DATE | Location | AMOUNT | PRICE | REFERENCES |
|------|----------|--------|-------|------------|
| 8/25/15 | Albert's House | .71 grams+ | $50.00? | R. Vol. V, pp. 900, 904-5 |
| 9/8/15 | Live Oak & Poplar Slidell, LA | .17 grams | $30.00 | R. Vol. V, pp. 986, 992-3, 1015, 1021-2, R. Vol. V, pp. 1135-6 |
| 11/5/15 | Slidell, LA | .3 grams | $40.00 | R. Vol. V., pp. 1024, 1040 R. Vol. VI, pp. 1138-9, 1143 |

Equally explained is how Albert, who had to borrow $20.00 from Ms. Hendricks to purchase one day's supply of Heroin the street value(s) above, was going to buy Heroin and Marijuana for $50.00? Where did the ¾ gram to almost assuredly 1 gram (counting the unquantified amount in the syringe) came from? It is against this background that Mr. Laue's appeal must be considered.

## STANDARD OF REVIEW AND APPLICABLE LAW

LSA-R.S. 14:30.1 (A)(3) provides proscribes the killing of a human being where (1) the offender unlawfully distributes or dispenses a Controlled Dangerous Substance listed in Schedules I – V of the Controlled Dangerous Substances Law, or any combination thereof, which (2) is the direct cause of the death of (3) the recipient who ingested or consumed the Controlled Dangerous Substance. *E.g., State v. Hano*, 938 So.2d 191 (La. App. 1st Cir. 2005). Proof beyond a reasonable doubt of *all* of the above is a condition precedent to conviction pursuant to the statute. *Hano*, supra, p. 186; *Mussall*, supra.

*Proof by circumstantial evidence – LSA-R.S. 15:438*:

Where circumstantial evidence comprises all, or a portion of the "proof" offered against a criminal defendant specific rules apply irrespective of and complimentary to whether circumstantial evidence

constitutes all or a portion of the "proof." LSA-R.S. 15:438 provides:

> The rule as to *circumstantial evidence* is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must *exclude every reasonable hypothesis* of innocence (*emphasis added*).

Were the "proof" offered against a defendant consists of a mixture of direct and circumstantial evidence Judge Lanier writing for the Court in *State v. Eason*, 2019 La. App. LEXIS (La. App. 1st Cir. 2019) noted:

> When a conviction is *based on both direct and circumstantial evidence*, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When analyzing circumstantial evidence, LSA-R.S. 15:438, provides that, in order to convict, the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. The facts then established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime (*Id.*, p. 8).

In *State v. Watts*, 168 So.3d 441 (La. App. 1st Cir. 2014), Judge Crain, writing for the Court noted:

> A conviction based on insufficient evidence cannot stand, as it violates Due Process. See: U.S. Const. Amend XIV; La. Const. Art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, this court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also:* La.C.Cr.P. Art. 821 B; *State v. Mussall*, 523 So.2d 1305, 1308-9 (La. 1988). The *Jackson* standard, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial for reasonable doubt. *State v. Petitto*, 116 So.3d 761, 766 (La. App. 1st Cir. 4/26/13); *State v. Patorno*, 822 So.2d 141, 144 (La. App. 1st Cir. 6/21/02).

> When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. *State v. Wright*, 730 So.2d 485, 487 (La. App. 1st Cir. 2/19/99). When analyzing circumstantial evidence, Louisiana Revise Statute 15:438 provides that, in order to convict, the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. *Petitto*, 822 So.2d at 144. The facts then established by the direct evidence and inferred from the circumstances established by the evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime (*Id.*, p. 444).

In *State v. Mitchell*, 772 So.2d 78 (La. 2000), Justice Knoll noted:

> Under LA. CODE CRIM. PROC. Art. 804 (A), a trial judge is required to instruct the jury that each element of the crime necessary to constitute guilt, must be proven beyond a reasonable

doubt. In cases involving *circumstantial evidence*, the trial judge must instruct the jurors that the evidence must exclude every *reasonable hypothesis* of innocence. LA. REV. STAT. § 15:438. On Appeal, the reviewing court "does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events." *State v. Davis*, 637 So.2d 1012, 1020 (La. 5/23/94). Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt (*Id.*, p. 83).

*Application of the Jackson standard – General Precepts:*

In *State v. Mussall*, 523 So.2d 1305 (La. 1988), Justice Dennis writing for the Louisiana Supreme

Court wrote:

> In *Jackson v. Virginia*, 443 U.S 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court granted certiorari to consider the Petitioner's claim that under *In re Winship*, supra, a federal habeas corpus court must consider now whether there was any evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of facts to find guilt beyond a reasonable doubt. In deciding the question, the high court held that Fourteenth Amendment Due Process requires a federal court reviewing a state conviction to do more than determine whether the reasonable doubt instruction had been given at trial and whether there was any evidence to support the conviction. Additionally, Due Process requires the reviewing court to determine "whether, after reviewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, supra, 433 U.S., at 319, 99 S.Ct., at 2789, 61 L.Ed.2d, at 573.

> Shortly after *Jackson v. Virginia* was decided, this court, in opinions by Justice Tate, recognized that although the issue arose in terms of federal habeas review, the *Jackson* holding also applies to state direct review of criminal convictions, and began to apply it in state criminal appeals. *State v. Abercrombie*, 375 So.2d 1170, 1177-8 (La. 1979); *State v. Mathews*, 375 So.2d 1165, 1167-9 (La. 1979). Despite a few erroneous but ineffectual statements to the contrary, *e.g., State v. Main Motors, Inc.*, 383 So.2d 327, 328 (La 1979), the *Jackson* doctrine has in fact been applied by this court ever since. *State v. Rosiere*, 488 So.2d 954, 968 (La. 1986); *State v. Captville*, 448 So.2d 676, 678 (La. 1984); *State v. Allen*, 440 So.2d 1330, 1333 (La. 1983); *State v. Dykes*, 440 So.2d 88, 93 (La. 1983); *State v. Sutton*, 436 So.2d 471, 474-5 (La. 1983).[15]

> Moreover, the constitution and laws of Louisiana afford bases for an equally rigorous state standard review. The Legislature has embraced the federal Due Process doctrine by adding La.C.Cr.P. Art. 821 through Act. No. 144 of 1982, which establishes a *Jackson*-like standard for Post-Verdict Motions for Acquittal based on insufficiency of evidence. See: *State v. Captville*, supra, at 678. Our state constitution's Due Process Clause is virtually identical to his Fourteenth Amendment model. La. Const. Art. I, § 2. The explicit right of a person accused of a crime to be presumed innocent until proven guilty provides an additional guarantee against criminal conviction based on inadequate evidence. La. Const. Art. I, § 16. The guarantee that no person

---

15 There is a plethora of cases cited by Justice Dennis that Mr. Laue is omitting from this excerpt.

shall suffer "imprisonment or forfeiture of rights or property ... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based" indicates that a reviewing court must base its decision upon all of the evidence. La. Const. Art. I, § 19.

The *Jackson v. Virginia* doctrine involves more than simply applying a fixed standard to measure the simple quantum of the evidence produced in a case. Careful study must be given to both the majority and concurring opinions to fully understand the precise methodology which must first be followed to determine objectively whether any rational trier of fact would have had a subjective doubt about the defendant's guilt. First, a review of a criminal conviction record for sufficiency of evidence does *not* require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson*, supra, at 319.

Second, a reviewing court must consider the record through the eyes of a hypothetical rational trier of fact who interprets all of the evidence as favorable to the prosecution as any rational fact finder can. Third, the inquiry requires the reviewing court to ask whether such a hypothetical rational trier of fact interpreting all of the evidence in this matter could have found the essential elements of the crime beyond a reasonable doubt.

The principle criterion of a *Jackson v. Virginia* review is *rationality*. This is because under *Winship* and *Jackson* Fourteenth Amendment Due Process demands that in state trials, as has been demanded traditionally in federal trials, a criminal conviction cannot constitutionally stand if its based on a record from which *no rational* trier of fact could find guilt beyond a reasonable doubt. Accordingly, under the *Jackson* methodology a reviewing court is required to view the evidence from the perspective of a hypothetical *rational* trier of fact in determining whether such an unconstitutional conviction has occurred. In reviewing the evidence, the whole record must be considered because a *rational* trier of fact would consider all of the evidence, and the actual trier of fact is presumed to have acted *rationally* until it appears otherwise. If *rational* triers of fact could disagree as to the interpretation of the evidence, the *rational* trier's view of all the evidence most favorable to the prosecution must be adopted. Thus, *irrational* decisions to convict will be overturned, *rational* decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of Due Process of Law.

The *Jackson* doctrine or methodology is a compromise between the one extreme that maximizes the protection against the risk that innocent persons will be erroneously convicted by appellate replication of criminal trials and the other extreme that places the greatest faith in the ability of the triers of facts to produce just verdicts. Not only did the Supreme Court abjure any requirement that a reviewing court retry the same issue of guilt, but it also rejected all forms of limited review under which a partial or one-dimensional view of the evidence is accepted as an index of its actual probative value. The *Jackson* doctrine does not permit the reviewing court to view just the evidence most favorable to the prosecution and then to decide whether that evidence convinced it beyond a reasonable doubt. Nor does it require a court to decide whether, based on the entire record, the *average* trier of fact could be convinced of guilt beyond a reasonable doubt. And of course, the high court abrogated the "no evidence" rule in *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) because "it could not seriously be argued that ... a modicum of evidence could by itself rationally support a conviction beyond a reasonable doubt." *Mussall*, pp. 1309-10.

Moreover, credibility determinations made by a jury are *not* beyond the purview of *Jackson/Mussall*. In *State v. HLJ*, 6 So.3d 997 (La. App. 3rd Cir. 2009), Judge Genovese writing for the Third Circuit Court of Appeal noted:

> Louisiana Constitution have previously discussed the extent to which a reviewing court may question credibility determinations made by the fact finder. "It is not the function of an appellate court to assess credibility ..." *Id.*, at 1286. "The actual trier of fact's *rational* credibility calls ... are preserved through the requirement that upon judicial review all of the evidence is to be considered as if by a rational fact finder in the light most favorable to the prosecution ..." *Mussall*, 523 So.2d at 1311 (citing *Jackson*, 443 U.S. 307). "*[T]he actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of Due Process of Law.*" *Id.*, at 1310 (citing *Jackson*). "In the absence of internal contradiction or irreconcilable conflicts with the physical evidence, the testimony of one witness, if believed by the court, is sufficient to support a conviction or convictions." *State v. Stec*, 749 So.2d 784 (La. App. 5th Cir. 11/30/99).

*Application of the Jackson standard in cases involving circumstantial evidence:*

> In his concurring opinion in *Mitchell*, supra, Justice Lemmon noted:

> This case raises concerns about the interrelationship between the sufficiency of the evidence standard in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and the circumstantial evidence rule in La. Rev. Stat. 15:438. However, any dichotomy between these two standards is unnecessary and may be confusing. *State v. Chism*, 436 So.2d 464 (La. 1983) (Blanche, J., concurring). The *Jackson* standard is constitutionally required by the Due Process Clause of the Fourteenth Amendment, while La. Rev. Stat. 15:438 is a statutory (not constitutional) standard of evidence that forms part of the inquiry by the finder of fact in assessing the evidence in a case where the evidence is circumstantial, in whole or part.[16]

> In a case of *circumstantial evidence*, exclusion of every *reasonable hypothesis* of innocence is a component of the more comprehensive reasonable doubt standard. *State v. Wright*, 445 So.2d 1198 (La. 1984). However, a single standard for appellate review, comporting wit the sufficiency standard established in *Jackson*, is all that is constitutionally required. *State v. Shapiro*, 431 So.2d 372 (La. 1982)(Lemmon, J., concurring)("Reasonable doubt must be excluded by the totality of the evidence in order for the trier of fact to convict and for the reviewing court to affirm a conviction. Hypotheses of innocence are merely methods of the trier of fact to determine the existence of a reasonable doubt arising from the evidence or lack of evidence").

> Similarly, in *State v. Patrono*, 822 So.2d 141 (La. App. 1st Cir. 2002), Judge Kuhn noted that:

> The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. See: La.C.Cr.P. Art. 821. the *Jackson* standard of review, incorporated in Article 821, is

---

16 (Court footnote). 1 "Although the circumstantial evidence rule may not establish a stricter standard of review than the more standard general reasonable juror's

an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. *State v. McLean*, 525 So.2d 1251, 1255 (La. App. 1st Cir.).

## LAW AND ARGUMENT

## ISSUE NO. 1 AND 2

**Reasonable jurists would determine that the jury's verdict as to Count One should be reversed as the evidence against Mr. Laue was constitutionally insufficient. No rational trier of fact, viewing the evidence in the light most favorable to the State could have found Mr. Laue guilty beyond a reasonable doubt; and Reasonable jurists would determine that the jury's verdict as to Count One should be reversed as the evidence against Mr. Laue failed to exclude every reasonable hypothesis of innocence as required by LSA-R.S. 15:438 and Louisiana and federal jurisprudence. Therefore, no rational trier of fact, viewing the evidence in the light most favorable to the State could have found Mr. Laue guilty beyond a reasonable doubt.**

In Rebuttal Closing Argument, almost the last thing the State told the jury was to convict Mr. Laue

because he sold Mr. Marant Heroin – notwithstanding the palpable absence of evidence that he sold

him the Heroin that caused his death:

> I do have to say that in the event, just simply for argument sake, *if you want to believe that based on defense counsel's numbers that come from I don't know where, if you want to believe that it was possible that Albert also got Heroin from somebody other than Joe, and that's why there was so much left, if you want to believe that in some realm that's a possibility, it doesn't change the fact that Albert got Heroin from Joe. He ingested Heroin and he died of a Heroin overdose.* The Judge is going to tell you during during instructions, that it is not essential that the defendant's act was the sole cause of the victim's death. So, if you believe that it was possible that Albert got Heroin from both Joe and whoever this Matt character was on the day that he died, then he is still guilty of Second Degree Murder because the ingestion of both Heroins from both places absolutely was the direct cause, set in motion the events that caused Albert's death on that day. Whether he only got it from Joe or you believe he got it from Joe and somebody else doesn't change the facts, we have proven each and every element of each and every crime beyond a reasonable doubt (Rec.Vol. VI, pp. 11198-9 (*emphasis added*).

This thread of argument encapsulates how the jury was induced to ignore the district court's

circumstantial evidence instruction (Rec.Vol. VI), and unreasonably reject an eminently reasonable

hypothesis of innocence. It also demonstrates how both the State and the jury conflated the LSA-R.S.

14:30.1 (A)(3)'s requirement that a Controlled Dangerous Substance be a "direct cause of death" wit

the mere sale of Scheduled Drugs (CDS) to someone who thereafter dies of an overdose with no evidence that the drug[17] *purchased* from the defendant induced the death in whole or in part.

Louisiana law does not require that a defendant's sale of a CDS be the sole cause of death in order to obtain an LSA-R.S. 14:30.1 (A)(3) conviction. *State v. Hano*, 938 So.2d 181 (La. App. 1st Cir. 2006). But it does have to be *a* cause. If the jury could not reasonably reject the hypothesis that Albert purchased Heroin from multiple sources and did not consume any from Mr. Laue on August 25, 2015, an essential element of Second Degree Murder was unproved, and his conviction must be reversed.

The analysis of this proposition is straightforward:

(1) **Would Albert's purchase of and consumption of Heroin from a source other than Mr. Laue be a reasonable hypothesis?** Yes. (Albert's long-standing Heroin addiction and relationships with Matt Eagle and "Bob" make this an eminently reasonable hypothesis).

(2) **Is there any direct evidence of who Albert purchased Heroin from on August 25, 2015?** No. (There is no *direct* evidence that the Heroin that caused or contributed to his death was purchased that day much less from whom. No one went with Albert when he bought it and he did not speak to anyone afterwards and identify the seller(s)). Moreover, Albert was in contact with both Mr. Laue and Mr. Eagle that day and Mr. Eagle was the last person he talked to.

(3) **Is there any direct evidence of how much Heroin Albert bought on August 25, 2015?** No. The trial evidence was that the .71 grams of Heroin *remaining* at Albert's house[18] significantly exceeds the amount he could have purchased from Mr. Laue. Based on purchases allegedly made from Mr. Laue during the relevant time period, there was twice as much remaining as Mr. Laue allegedly sold in either September or November 2015 – the sales in Counts 2-4 of the Indictment. This leads ineluctably to the conclusion that someone other that Mr. Laue (if he purchased anything from him) on *August 25, 2015* or he purchased from someone else (Matt Eagle) who "fronted" the money.

Whether Albert was out of Heroin on the day he died is an open question. Ms. Hendricks testified he felt badly that day because he had none. If he had none, he could not have purchased a quantity leaving an excess of .71 grams for $50.00 - $20.00 of which he had to borrow from Ms. Hendricks. Moreover, he told his sister, Amanda, he would pick up marijuana for them on the way home. How was he going to pay for it:

If Albert had other Heroin available to him on *August 25, 2015,* then nothing but speculation supports the notion that it came from Mr. Laue.

(4) **Did *anything* in the investigation of either Albert's death or the September and November 2015 sales tie the Heroin Albert used on August 25, 2015 to Mr. Laue?** No. (Even though the SPD had the Heroin left in the syringe at the scene of Albert's death *and*

---

17 As used here "drug" refers not to type, but to the actual amount ingested.
18 Not of the amount he consumed and the amount remaining in the syringe.

the Heroin seized in September and November 2015, no attempt was made to determine any similarity, especially strength.[19]

(5) **In the absence of evidence that Albert used Heroin supplied by Mr. Laue on August 25, 2015, is there any evidence that Mr. Laue's actions constituted a direct cause of Albert's death?** No. There is no evidence that any Heroin Mr. Laue sold to Albert on August 24, 2015 remained in his system. Ms. Hendricks' testimony is to the contrary.[20] Unless there was competent evidence (and there was not) that Albert had Heroin in his system on **August 25, 2015** that he purchased from Mr. Laue on **August 24, 2015** *and* it contributed to his death, the necessarily reasonable doubt that Albert consumed Heroin purchased fro Mr. Laue on **August 25, 2015** is fatal to the State's case. To hold otherwise would be to impose a form of market share criminal liability based on the "syllogism" suggested by the State's Rebuttal Argument: "... *Albert got Heroin from Joe. He ingested Heroin and he died of a Heroin overdose.*"

Merrian-Webster's dictionary (Webster's) defines *reason*[21] as, *inter alia*, "a rational ground or motive." Not surprisingly, Webster's defines *reasonable*[22] as being in accordance with reason. Mr. Laue contends that the hypothesis of innocence be offered at trial – that Albert Marant's death could have (and indeed) resulted from drugs obtained from another source – *was/is reasonable as a matter of law*. Therefore, a *rational* trier of fact could not have found him guilty of Second Degree Murder, in violation of LSA-R.S. 14:30.1 (A)(3).

The jury's verdict on the Second Degree Murder charge was necessarily based *entirely* on circumstantial evidence. It was undisputed at trial that no one accompanied Mr. Marant when he purchased the Heroin he claimed to have caused his death and no video or audio evidence was introduced at trial directly demonstrating who supplied it.

Louisiana statutory law (LSA-R.S. 15:438) and jurisprudence (*e.g.*, *State v. Eason*, 2019 La. App. LEXIS 2374 (La. App. 1st Cir. 12/27/19)) dictate that in order to convict a criminal defendant based on circumstantial evidence it "... must exclude reasonable hypothesis of innocence." R.S. 15:438; *Eason*,

---

19 Ms. Hendricks testified to the strength of the Heroin she and Albert used on August 24, 2015.

20 *Hano*, *supra*, is inapposite on the issue. There, the issue was whether the CDS provided by the defendant had to be the sole cause of death. The decedent in *Hano* had both Methadone and Benzodiazepine in his system at death. *Hano*'s own toxicologist testified the Methadone could not be separated from the Benzodiazepine with respect to the cause of death. *Id*, pp. 191-2.

21 www.Meriam-Webster.com/dictionary/reason.

22 www.Meriam-Webster.com/dictionary/reasonable.

p. 8).

Mr. Laue provided a compelling hyper-vigilante of innocence *grounded in the testimony of the State's witnesses*: more undifferential Heroin was found at the scene of Mr. Marant's death than could be accounted for by the purchase prices the State contended Mr. Laue was charging for Heroin.

The jury's determination that the State proved beyond a reasonable doubt that Mr. Laue caused Mr. Marant's death by distribution of a Controlled Dangerous Substance was *unreasonable, irrational,* and contrary to the tenets of *Jackson*, *Mussall*, and LSA-R.S. 15:438. It was overwhelmingly likely that it was the result of the State's Rebuttal Closing syllogism that "... *if you want to believe that it was possible that Albert also got Heroin from someone other than Joe, and that's why there was so much left, if you want to believe that in some realm that's a possibility, it doesn't change the fact that Albert got Heroin from Joe. He ingested Heroin and he died of a Heroin overdose*" (Rec.Vol. VI, pp. 1198-9)(*emphasis added*). This was precisely the (improper) argument Mr. Laue sought to avoid by filing a Motion to Sever the Drug Possession/Distribution counts of the Indictment from the Second Degree Murder count.

## CONCLUSION

This Court must note that the decisions of the Louisiana First Circuit Court of Appeal and the Louisiana Supreme Court conflicts with *Jackson v. Virginia*, supra; *State v. Mussall*; *State v. Ortiz*, 701 So.2d 922 (La. 1988); Justice Crichton's concurring opinion in *State v. Cohen* 315 So.3d 202 (La. 2021); *State v. Chambers*, 933 So.2d 200 (La. App. 3rd Cir. 2006); *State v. Chambers*, 2016 La. App. LEXIS 2513 (La. App. 5th Cir. 2016); and, LSA-R.S. 15:438.

Furthermore, as a matter of first impression, does a hypothesis of innocence which must be excluded pursuant to LSA-R.S. 15:438 have to be *more* reasonable than the evidence produced by the State, *equally* reasonable, or *simply* reasonable? **Mr. Laue answers: No.**

Also, the Louisiana First Circuit Court of Appeal and the Louisiana Supreme Court erred in: (a) concluding that accepting Mr. Laue's hypothesis of innocence would require it to second-guess/reject the jury's credibility determinations; (b) apparently determining that there was conflicting testimony concerning factual matters which precluded it from finding a rational jury could not have reasonably rejected Mr. Laue's hypothesis of innocence; (c) apparently weighing Mr. Laue's hypothesis of innocence against the State's case; and, (d) apparently deciding that because the jury *could* have reasonably concluded that the elements of LSA-R.S. 14:30.1 (A)(3) *could* be determined to have been present; that the reasonableness of Mr. Laue's hypothesis of innocence was negated.

Mr. Laue's conviction of Second Degree Murder, in violation of LSA-R.S. 14:30 (A)(3) must be reversed. The State failed to exclude Mr. Laue's reasonable hypothesis of innocence – that Albert Marant consumed Heroin purchased from someone else other that Joseph Laue which caused his death and that *if* any Heroin was purchased from Mr. Laue it was contained in the .17 grams remaining at the scene of Mr. Marant's death. Because the State's defalcation undermines the sufficiency of the evidence, a judgment of acquittal should be entered in Mr. Laue's favor.

For the reasons stated above and in the previous filings in the State of Louisiana Courts, Mr. Laue's Writ of Certiorari should be granted, and this matter be remanded to the district court for a dismissal; or in the alternative, a new trial. Mr. Laue has shown that this conviction is contrary to clearly established federal law as established by the United States Constitution and the United States Supreme Court; and that reasonable jurists would debate the validity of the conviction.

Done this 3rd day of March, 2022.

Respectfully submitted,

_____

Joseph Laue