| | |
|---|---|
| STATE OF LOUISIANA | DOCKET NO. 581,152   DIV. F |
| VERSUS | 22ND JUDICIAL DISTRICT COURT |
| | ST. TAMMANY PARISH |
| JOSEPH V. LAUE | STATE OF LOUISIANA |

---

### MEMORANDUM IN SUPPORT OF SECOND POST CONVICTION RELIEF

---

MAY IT PLEASE THE COURT:

PETITIONER, Joseph Laue, *pro se*, moves this Court pursuant to the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Article 1, Sections 2, 3, 5, 13, 14, 16, 17, 20, 22 and 24 of the Louisiana Constitution of 1974, Article 1151 of the Louisiana Code of Civil Procedure, and Articles 926, 926.3, 930, 930.3, 930.7 and 930.8 of the Louisiana Code of Criminal Procedure, to grant his application for post-conviction relief. Mr. Laue is alleging his conviction is invalid and should be set aside based on a final ruling of an appellate court, here the Louisiana Supreme Court, establishing a theretofore unknown interpretation of constitutional law as set forth in *State of Louisiana v. Larry West*, 2024-0133 (La. 1/28/25), 399 So. 3d 405, and *State of Louisiana v. Deon Ray Bartie*, 2024-0897 (La. 2/1/25), 400 So. 3d 896.

### I. INTRODUCTION

This is a drug-induced homicide case that was taken to trial in 2019. Laue was convicted and sentenced to life in prison. He appealed, and was denied. He sought post conviction relief, and was denied in 2024. He currently has a federal habeas corpus pending in the Eastern District, which he intends on placing in abeyance while this Court considers these new constitutional claims.

Since the denial of Laue's first post conviction application, two rulings of an appellate court, here the Louisiana Supreme Court, have been handed down and become final this year. Both Louisiana Supreme Court cases establish a theretofore unknown interpretation of constitutional law. The first final ruling is regarding the Sixth Amendment's Confrontation Clause. The second final ruling is regarding due process, more specifically the sufficiency of evidence to convict, in a drug-induced homicide matter. Both cases greatly impact Laue's rights under the law, and both cases, had they been known and available at the time of Laue's trial in 2019, would have produced a different outcome, or would not have been brought at all.

The *West* case, through the Louisiana Supreme Court, has officially abrogated the First Circuit Court of Appeal's allowing "surrogate" coroner testimony, which previously was not considered to be testimonial in nature. Once upon a time, and specifically during Laue's trial and direct appeal, this permitted the First Circuit to apply a *per se* rule of admissibility for autopsy reports. This practice allowed trial courts, like St. Tammany Parish, to admit these autopsy reports even when a defendant did not have an opportunity to cross-examine and confront the forensic pathologist/coroner who performed the actual autopsy. As recognized by the Louisiana Supreme Court, however, this First Circuit interpretation runs gravely afoul to the Sixth Amendment confrontation clause.

The second matter came through the ranks of the Third Circuit Court of Appeal and ultimately before the Louisiana Supreme Court in a drug-induced homicide case brought against Deon Ray Bartie. Despite the drug-induced homicide law existing since the late 80's, the drug-induced homicide statute in La. R.S. 14:30.1(3) and (4) does not have a lot of treatment. As will be shown below, most stem from St. Tammany Parish, and the case names are readily known to those studying this niche area of law. These household names are Jeannie Hano, Walter Kott, Jarret McCasland, and Joseph Laue. And because most stem from St. Tammany Parish, the First Circuit Court of Appeal has, for the most part, crafted the law as it now appears.

Beginning with the *Hano* case, the First Circuit, interpreting the "direct cause of death" element, adopted a test that does not fit the intricacies of a drug-induced homicide case. The test came from *State v. Jones*, 598 So. 2d 511, 514 (La. App. 1 Cir. 1992) and this lazy adoption has caused constitutional trouble ever since.[1] The *Jones* test essentially states that the act of the defendant does not have to be the "sole cause of death" as long as it is a "contributing cause" of death. The problem with this 1992 *Jones* case is that it is not a drug-induced homicide case. It is a murder case that stemmed from a bar fight. The intricacies of the drug-induced homicide statute's "direct cause of death" element, on the other hand, is highly scientific, requiring every bit to be met by scientific, medical evidence. *Jones's* contributing cause simply does not work in a drug-induced homicide case that must resolve

---

1 Exaggeration? Take a look at the second degree murder drug-induced homicide statute. A conviction under this statute providing for life in prison is easier to obtain than a much less harsh negligent homicide conviction, where negligent homicide at least requires the State to prove some sort of criminal behavior (negligence, recklessness, etc.). And manslaughter is not a responsive verdict for a drug-induced homicide under second degree murder. This large gap (second degree murder to negligent homicide) creates problem for the State (and a defendant) who has an easier time obtaining second degree murder conviction, which is why this recent Legislative Session, the Legislature passed a bill to enact a drug-induced manslaughter statute. *See,* Act 169 of the 2025 Legislative Session.

all reasonable doubt for potential causes of death. As for Hano, Kott, and Laue, the First Circuit sealed their fate with this lazy adoption of the *Jones* test into the fold of drug-induced homicide. The Third Circuit departed from the First Circuit, and the Louisiana Supreme Court agreed, that evidence is constitutionally deficient under a loose, contributing cause analysis. It simply does not meet beyond a reasonable doubt when the State can obtain a conviction when multiple drugs "could" have been the fatal drug, and for which the defendant did not distribute all of the fatal drugs. In a careful reading with an eye on due process and the judicial system's highest burden of proof, *Bartie* holds that a defendant must have distributed all of the fatal drugs in the decedent's system in order to convict. If you contribute one of the several fatal drugs in the system, an acquittal is the only response that withstands due process sufficiency.

## II.    STATEMENT OF FACTS

Petitioner, Joseph Laue, was accused of selling drugs to Albert Marant who, outside of anyone's presence, ultimately overdosed and died. The St. Tammany Parish Coroner's Office classified the manner of death as an "accident."[2] The cause of his death was perhaps heroin toxicity[3] or perhaps multiple toxicity.[4]

Within two hours before Marant died, he communicated by cell phone with two people: his known, historical heroin dealer, Matt Eagle, and Joseph Laue. The last person Marant ever spoke to during his life was his main heroin dealer, Matt Eagle. Because of inferences stacked on inferences, however, Laue was charged almost 12 months post-death, convicted, and sentenced to life in prison despite the purchase of drugs being unwitnessed, and despite the death being unwitnessed, and despite Albert Marant having multiple fatal drugs in his system.

Testimony from forensic toxicologist, John Lizzaraga, who performed a toxicology analysis, provided:

> The results of the toxicological analysis were positive for 6-Monoacetylmorphine (a metabolite of heroin), morphine, salycidic acid (a metabolite of aspirin), marijuana metabolites, codeine (commonly present in heroin), an opiate (specified in the urine sample results as hydromorphone), and THC (an inactive metabolite of THC that has no pharmacological effect).[5]

---

2  Rec. 966.
3  Michael Defatta, MD, St. Tammany Parish's Chief Deputy Coroner, using an odd phraseology, declared himself "fine" with the autopsy report prepared by Dr. Kikuchi pronouncing heroin toxicity as the medical cause of Mr. Marant's death. Rec. 979. It is unknown what or where "fine" stands in relationship with evidentiary standards.
4  John Lizarraga, a forensic toxicologist formally (during the time surrounding Mr. Marant's death) with the St. Tammany Parish on the other hand testified he could not rule out Multiple Toxicity. Rec. 944.
5  *State v. Laue*, 2020-0225 (La. App. 1 Cir. 12/30/20), 326 So. 3d 267, 276.

According to Jean Kaufman, a Slidell Police Department crime scene technician and evidence custodian:

> [t]he victim had a scar and small lesions in the crook of his arm. A substance, 0.71 grams of suspected heroin, was located on a green card on top of the clothes dryer, along with a spoon and a cell phone. A syringe that contained 3.10 grams of suspected heroin was located on the bathroom floor.[6]

These two weights did not include the actual weight of the substance ingested and the amount that was spilled on the floor. The total amount of alleged heroin found at the crime scene was thus:

```
  .71  grams of powdered heroin
+ 3.10 grams of liquid heroin
+ ???  grams of ingested heroin (Never determined)
+ ???  grams of heroin spilled on the floor (Never determined)
  3.80 (at least) grams of heroin found at the scene
```

Evidence of Laue's previous typical sales submitted at trial for comparison purposes, however, showed that Laue sold 0.10 grams of heroin in September for $30.00, and 0.25 grams of heroin in November for $40.00. The evidence presented was that, if (and this is a huge if) Marant purchased from Laue, on the day of his death, he purchased $50.00 worth, which according to Laue's previous sales would put the $50.00 bag in the 0.3 to 0.5 gram range. The amount found at the crime scene does not correlate with Laue's price/portions. Just the 0.71 dry heroin alone exceeds what could have been purchased from Laue. And this .71 grams do not include the amount already taken out and ingested by Marant. This leaves an amount of over 3 grams of heroin that could not have come from Laue.

Taken all together, Lizzaraga testified multiple toxicity could not be completely ruled out. The St. Tammany Parish Coroner's Office through surrogate witness, Dr. Defatta, classified the manner of death as an "**accident**."[7] The cause of his death was perhaps heroin toxicity[8] or perhaps multiple toxicity.[9]

Additionally, it is undisputed that the sale of the heroin in question was not witnessed. It was also substantiated through Albert Marant's phone logs that the heroin could have been purchased from someone other than Joseph Laue. Specifically, Mr. Marant's phone logs showed that his last phone call made before he died was from his customary heroin dealer,

---

6  *Id.* at 271.
7  Rec. 966.
8  Michael Defatta, MD, St. Tammany Parish's Chief Deputy Coroner, using an odd phraseology, declared himself "fine" with the autopsy report prepared by Dr. Kikuchi pronouncing heroin toxicity as the medical cause of Mr. Marant's death. Rec. 979. It is unknown what or where "fine" stands in relationship with evidentiary standards.
9  John Lizarraga, a forensic toxicologist formally (during the time surrounding Mr. Marant's death) with the St. Tammany Parish on the other hand testified he could not rule out Multiple Toxicity. Rec. 944.

Matt Eagle. The State, itself, provided this evidence of two potential people that the heroin could have come from.

The evidence provided that "Matt Eagle" had texted Mr. Marant, informing him that, "making another run, it's flame as hell, best I have had in two years, that I got had everyone lit up." Also, Mr. Marant had texted Mr. Laue with, "Joe, can you score for me," to which Mr. Laue responded, "depends on what u need," and, "it's gonna be the same, small, but good. idk how we gonna split it?"

The last text with Mr. Laue was at 3:24. Mr. Marant had a phone conversation with Matt Eagle at 3:46, which lasted over 7 minutes. Ali testified that Matt Eagle was the main dealer for Mr. Marant, and that she did not personally know where Mr. Marant went to purchase heroin, nor from who. This is bolstered by the fact that Ali testified that she did not witness the crime, and that the State failed to provide any testimony which would prove that Mr. Marant had purchased the heroin from Mr. Laue.

With the new interpretation of law by way of *West* and *Bartie*, Mr. Laue is claiming that he was denied his right to a fair and impartial trial when the State subsequently substituted the testimony of Dr. Defatta in lieu of Dr. Kikuchi during the course of this trial.[10] Although defense counsel strongly objected to the State's swapping of doctors, with proper arguments, the district court erroneously overruled the objection and allowed such because of the old interpretation.[11] As discussed below in great detail, this is no longer allowed under *West*.

### III. LOUISIANA'S NEW INTERPRETATION OF THE SIXTH AMENDMENT AS IT RELATES TO AUTOPSY REPORTS AND CORONER TESTIMONY.

Prior to the *West* case, trial courts allowed, and the First Circuit affirmed, the admission of autopsy reports because it was held they were non-testimonial in nature and thus lacked any Sixth Amendment Confrontation clause implications. The recent decision in Larry West changed that interpretation, and is now considered to contravene the Sixth Amendment.

In *State v. West*, *supra*, the Louisiana Supreme Court was presented with a Confrontation Clause issue arising from forensic pathology testimony, stemming from the same St. Tammany Parish Coroner, Dr. Michael Defatta, who was allowed to testify as a surrogate for Dr. Ann Lee, the forensic pathologist from St. Tammany that performed the actual autopsy.

On the basis of the Sixth Amendment, Larry West challenged the First Circuit Court of

---

10 R. 956.
11 R. 953.

Appeals allowing Dr. Michael Defatta (St. Tammany Parish Coroner's Chief Pathologist and Medical Director for Forensic Operations), to testify about the autopsy report prepared by Dr. Ann Lee, the forensic pathologist from the St. Tammany Parish Coroner's Office who performed the autopsy. See, *State v. West*, 2024-00133 (La. 11/6/24), 395 So. 3d 867 (La. 11/6/24).[12] The Louisiana Supreme Court specifically granted the writ because the First Circuit Court of Appeal made a bright line rule on the admissibility of autopsy reports. The First Circuit's bright light rule was:

> We now hold that a doctor's testimony to an autopsy report created by a different doctor does not violate the defendant's right to confrontation. Autopsy reports contain routine, descriptive, and non-analytical information. Unlike the sworn affidavits contemplated in *Melendez-Diaz*, autopsy reports are not testimonial in nature.

*Id., citing, State v. West*, 23-0289, p. 13 (La. App. 1 Cir. 12/27/23), 2023 WL 8923503 (unpub'd).

In a per curiam opinion, the Louisiana Supreme Court rejected this *per se* rule as unnecessary and improper, preferring an individualized assessment over *per se* rules about what is testimonial. *Id.* at 869. The Supreme Court granted the writ but denied relief because the violation, it believed, was harmless error because Dr. Defatta's testimony did not have any substantial or injurious effect on West because the cause and manner of death were not controverted.

In *West's* case, the primary dispute centered on the perpetrator's identity, and not on how the victim was killed. *State v. West*, 2024-0133 (La. 1/28/25), 399 So. 3d 405 (Mem). Here, however, the crux of Mr. Laue's defense depends on the coroner's forensic pathology testimony because the drug-induced homicide statute hinges on a determination of whether the death was a direct cause of the ingestion of the controlled dangerous substance. *See*, La. R.S. 14:30.1(A)(3).

Nevertheless on rehearing, the Louisiana Supreme Court vacated it's previous opinion. In another per curiam, the Louisiana Supreme Court granted the writ, and remanded it to the trial court. The Louisiana Supreme Court stated:

> We vacate our previously issued per curiam. We find that the court of appeal erred to the extent it applied a per se rule of admissibility for autopsy reports. See *Smith v. Arizona*, 602 U.S. 779, 803, 144 S. Ct. 1785, 1802, 219 L. Ed. 2D 420 (2024). We grant the writ application in part and remand to the court of appeal to reconsider defendant's confrontation clause claim in light of *Smith v. Arizona*.

---

12 This opinion was ultimately withdrawn from publication, and can no longer be found on Westlaw. See the hard copy of the opinion attached hereto.

*State v. West*, 2024-0133 (La. 1/28/25), 399 So. 3d 405 (Mem). Because the ruling is based on *Smith v. Arizona*, it is also briefed in detail below.

### A. The Smith v. Arizona Case

In *Smith v. Arizona*, the Supreme Court of the United States unanimously held that the Sixth Amendment's Confrontation Clause prohibits an expert witness from testifying about another non-testifying expert's statements and conclusions made in connection with scientific analysis where the defendant had no prior opportunity to cross-examine the non-testifying expert's statements and conclusions were relied on by the testifying expert as being true and accurate.

In December 2019, in Yuma County, Arizona, local police officers executed a search warrant on a property in the foothills. *Id*. At 1795. They found Jason Smith hiding in a shed on the property, together with what appeared to be a large quantity of drugs and drug-related items. Smith was charged with possessing methamphetamine and marijuana for sale, and possession of drug paraphernalia. In preparation for trial, the State sent the drugs seized to a state forensic crime lab for testing. The State identified Smith as the individual associated with the substances, the charges pending against him, and that a trial date was set. Analyst Elizabeth Rast discussed with the prosecutors about the substance examination, and then ran the requested tests. She prepared a typed note and an official report on DPS letterhead. She concluded that the substances seized were in fact methamphetamine and marijuana.

Three weeks before trial began, Rast quit working for the crime lab. As a result, the state called an "audible," replacing Rast with Gregory Longoni. Longoni was offered to "provide an independent opinion on the drug testing performed by Rast," and was "expected to have the same conclusion." *Id*. at 1795. Longoni took the stand and came to same conclusion, referring to Rast's report and notes, item by item. He did not retest the substances himself. Instead, Longoni testified that in his independent, expert opinion, based solely on his review of Rast's notes and report, the substances seized were methamphetamine and marijuana. Smith was convicted.

Smith appealed Longoni's testimony as violating his Sixth Amendment Confrontation Clause rights by the state's substitution of Longoni for Rast. The Arizona Court of Appeals rejected Smith's challenge, stating that under evidentiary rules, Rast's notes and report were not admitted at trial for the truth of the matter asserted in them but merely to establish the

basis for Longoni's in-court testimony about his own expert opinion. The Arizona Supreme Court denied discretionary review. The United States Supreme Court granted certiorari. *Id.* at 1796.

The Court began its analysis stating the basic principle of the Sixth Amendment. *Id.* at 1791. And that prohibition applies in full to forensic evidence. Citing *Melendez-Diaz*, a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing. *Id., citing, Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 307, 329 (2009). The Court then went through a long, abstract, discussion of determining whether evidence is submitted for its truth, then decided to show an application of the questions showing a confrontation clause violation. *Id.* at 1799.

The Court reminded that Longoni had no personal knowledge of Rast's testing of the seized items, and that what Longoni knew only came from Rast's records. Longoni was asked whether a specific drug item was tested by reviewing Rast's notes. He was further asked if Rast followed standard lab policies and practices. Longoni answered "yes" to both questions, but since Longoni was not there, he was simply relaying what he believed to be true from Rast's notes and report. Longoni was also asked whether "a blank was done to prevent contamination, make sure everything was clean?" Longoni answered, "According to the notes, yes." Longoni confirmed the drugs that Rast confirmed. *Id.* at 1799.

The Court stated that these and similar questions and answers shows that Rast's statements came in for their truth, and "no less because they were admitted to show the basis of Longoni's expert opinions:"

> All those opinions were predicated on the truth of Rast's factual statements. Longoni could opine that the tested substances were marijuana, methamphetamine, and cannabis only because the accepted truth of what Rast had reported about her work in the lab—that she had performed certain tests according to certain protocols and gotten certain results. And likewise, the jury could credit Longoni's opinions identifying the substances only because it too accepted the truth of what Rast reported about her lab work (as conveyed by Longoni). If Rast had lied about all those matters, Longoni's expert opinion would have counted for nothing, and the jury would have been in no position to convict. So the State's basis evidence—more precisely, the truth of the statements on which its expert relied—propped up its whole case. But the maker of those statements was not in the courtroom, and Smith could not ask her any questions.

*Id.* at 1799-1800.

The Court went on, "approving that practice would make our decisions in *Melendez-Diaz* and *Bullcoming* a dead letter, and allow for easy evasion of the Confrontation Clause. *Id.* Longoni

effectively became Rast's mouthpiece, testifying to the precautions (she said) she took, the standards (she said) she followed, the tests (she said) she performed, and the results (she said) she obtained," all of which were offered so the jury would believe it, for its truth. *Id.*

Thus, the Supreme Court held that: (1) the Confrontation Clause applies to forensic evidence; (2) that a state may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her; (3) Neither may the state introduce those statements through a surrogate analyst who did not participate in their creation; (4) Nothing changes if the surrogate presents the out-of-court statements as the basis for his expert opinion. *Id.* at 1802.

**B.     Laue Objected at Trial but was denied because the Old Interpretation Allowed Surrogate Coroner Testimony.**

Mr. Laue was properly informed that Dr. Kikuchi had already been notified that he would be testifying via Zoom in order to have him properly cross-examined by defense counsel.[13] During the hearing for the Motion to Suppress, defense counsel specifically addressed the Court as to his right to cross-examine Dr. Kikuchi.[14] The Court had specifically informed Mr. Laue that the State would be calling Dr. Kikuchi to the stand during trial despite the Notice of Demand for Testimony of Crime Lab Analyst which was filed pro se by Mr. Laue during the course of the pretrial. Therefore, this Court and the State were previously notified that Mr. Laue requested the testimony of Dr. Kikuchi.

In this case, Dr. Kikuchi performed the autopsy, and collected the blood and urine samples of the deceased, Albert Marant. At trial, however, the State offered Dr. Michael Defatta to testify as to Dr. Kikuchi's findings, and Dr. Kikuchi's autopsy, all at the objection of Petitioner. At each stage of this litigation, Petitioner zealously objected to this surrogate testimony as a violation of his Sixth Amendment Confrontation Clause right:

> BY MR. FONTENOT:
>     I am going to object to the introduction of the two reports [blood and urine] because I believe the witness has stated that these are based on samples provided to him. One of the questions I intend to be asking is further along those lines that he did not collect the samples. I believe they were collected by the doctor who did the autopsy, but in any event they were collected by someone else that is not here. I think it is necessary that the person who collected the samples be present. We object both to chain of custody as well as the 6th Amendment argument that our client has the right to cross all the witnesses against him, including who ever gathered the information that was submitted for these tests.

---

13 *See*, Motion to Authorize Testimony via Simultaenous Transmission Pursuant to La. R.S. 15:502 filed by the state on October 16, 2017 found at R. 109.
14 *Id.*

Page 9 of 19

BY MS. MCGINNESS:
Judge, these reports are no different than any other crime lab report. A chain of custody argument goes to the weight of the evidence not to the admissibility of the evidence. I don't remember the article itself off the top of my head but there is a specific statute that goes toward coroners reports and any other related activity that they are admissible.

BY MR. FONTENOT:
Your honor, first of all I don't know that it said that they are admissible but if she could show me the article we can deal with that at the appropriate time. However, the Constitution trumps any and all codal articles and also cite the case of *Melendez-Diaz*, the U.S. Supreme Court case that says that a defendant has the right to confront and cross examine witnesses against him. In that case, the Supreme Court specifically said that part of the way to test scientific evidence has to do with the—i forget the exact phraseology, but essentially that its not just someone's dishonesty, it could be used to have to do with someone's effectiveness or doing things the proper way. So, without being able to cross examine the doctor that did the autopsy and gathered the materials, you cannot question whether they were done in the proper way, which means that we are not able to properly confront and cross examine our accusers against the defendant. SO in accordance with *Melendez-Diaz* and the Constitution and our Sixth Amendment right, we object.

BY MS. MCGINNESS:
Judge, I don't think that's an appropriate argument for this particular witness. I think we can address that.

BY THE COURT:
I will deny it.

Tr. 930-931 (Sep. 24, 2019).[15]

Again, when the surrogate testimony was offered at trial, Petitioner's trial attorney, objected once more on Sixth Amendment Confrontation Clause grounds:

BY MR. FONTENOT:
Your Honor, before we bring the jury out, I wanted to put a few things on the record. My understanding, the next witness by the state will be Dr. Michael Defatta from the coroner's office, he will be discussing mattes arising out of the autopsy, and it is my understanding it will be brought out that Dr. Defatta was not the one that actually performed the autopsy. So, I will go ahead and lodge an objection at this time on the grounds that my client is being deprived of his sixth amendment right to confront the witness against him bu being unable to question and cross examine the doctor that actually the autopsy and actually gathered the samples, which previous witness testified that samples were gathered by, I believe, Dr. Kikuchi, so without Dr. Kikuchi, at least that was represented by the papers that were filed and delivered to me. So, without Dr. Kikuchi being present and open to cross examination on the gathering of the samples and the autopsy, I would object once again to any submission of evidence, the samples, the testing thereof, the autopsy, and/or its protocols, and any and all conclusions Dr. Defatta may testify to regarding the said autopsy as violated my client's 6th Amendment right. And I would ask that that be  - - well, first of all, I lodge an objection.

BY THE COURT:
Okay.

BY MS. MCGINNESS:
Judge, pursuant to code of criminal procedure article 105 and revised statute 331565, both the coroner's report and the process verbal that is done

---

15 See attached as Exhibit 1.

during the autopsy shall be admitted into evidence as competent evidence of death and cause thereof. There is case law that says the coroner or coroners deputy may testify as to the victim's death or cause of death even if that witness is not the one that performed the autopsy.

And in this particular case, Dr. Defatta did certify the death of Albert Marant and in doing that certification, did review the autopsy report that was done by Dr. Kikuchi, and both the coroners report and the death certificate in open file discovery.

BY MR. FONTENOT:
And your Honor, brief response. First of all, the law that she is citing actually says that it can be considered competent evidence of death and the case does not say shall be admitted. It just said that it can be considered as competent evidence.

BY THE COURT:
Okay.

BY MR. FONTENOT:
Secondly, those are statutory rules, they are trumped by the Constitution.

And then finally, the fact that Dr. Defatta reviewed the report is exactly my argument. Under all of the discussions in Melendez-Diaz in the United States Supreme Court, it is dealt with in detail and a lot of these situations the review of the report implies that everything was done correctly when that report was generated and without being able to cross examine the person who actually gathered the report, there is no way to test that assumption. So, I would make the objection on constitutional grounds.

BY MS. MCGINNESS:
Judge, the case law is clear that the coroner's report doesn't have sixth amendment application because it is non-testimonial.

Also, Melendez-Diaz applies to state crime lab analysts. The people that perform the actual testifn of the materials have testified and will continue to testify.

BY THE COURT:
Just to put an end to it, I will rule. I will deny the objection.

Tr. 953-956 (Sep. 24, 2019).[16]

It is rather plain that Laue's Sixth Amendment Confrontation Clause violation would not have been possible in light of the new interpretation under Larry West, Louisiana Supreme Court precedent.

### IV. LOUISIANA'S NEW INTERPRETATION OF DRUG-INDUCED HOMICIDE CASES WHERE THE DEATH IS CAUSED BY MULTI-TOXICITY.

In a multi-toxicity case, the defendant must be responsible for distributing each of the drugs that the victim ingested that were the direct cause of death. In other words, if there are three lethal levels of toxins (drugs) that was the direct cause of death in a multi-toxicity overdose case, the defendant must have distributed all three. Otherwise, the defendant is being held responsible for criminal conduct that is not attributed to him. As discussed below,

---

16 See attached as Exhibit 1.

this was not the same interpretation prior to *State v. Bartie,* 2024-00897 (La. 2/1/25), 400 So. 3d 896.

Bartie was convicted for the death of Brittany Lapeyrouse whose cause of death was a multi-toxicity drug overdose. The evidence established that Bartie was responsible for distributing methamphetamine to the victim, and possibly Xanax. Methamphetamine and Xanax were in the victim's system when she died. In addition to the methamphetamine and Xanax in the victim's toxicology report, the victim also had morphine (either heroin or codeine), fentanyl, and amphetamine in her system at death. Medical evidence established that there were lethal levels of methamphetamine alone. *State v. Bartie*, 2023-780 (La. App. 3 Cir. 6/20/24), 389 So.3d 1024, 1032. It also established that there were lethal levels of fentanyl alone. It also established that there were lethal levels of morphine alone. It also established that there were lethal levels of amphetamine alone. On re-direct, Dr. Tape affirmed the same point (lethality) regarding methamphetamine. *Id.*

That is, there were three drugs out of the five drugs that were at lethal levels. However, Bartie was not charged or responsible for distributing the fentanyl, codeine, heroin, or the amphetamine, which was distinct from methamphetamine. Bartie was convicted nevertheless because the state of the law was that the distributed drug did not need to be the sole cause of death as long as it was the direct cause of death, which has been heretofore interpreted as being simply a contributing factor in the death. *See, State v. Hano,* 2005-2090 (La. App. 1 Cir. 6/9/06), 938 So. 2d 181, *citing, Jones. See also, State v. Laue*, 2020-0225 (La. App. 1 Cir. 12/30/20), 326 So. 3d 267.

After Bartie was convicted by a jury, the Third Circuit split from the flawed First Circuit line (*Hano, Kott,* and *Laue*) which adopted the insidious contributing cause analysis found in *Jones.* It is St. Tammany Parish almost exclusively, and the First Circuit that have notoriously escaped the rigors of reasonable doubt under this lazy interpretation of direct cause. The Louisiana Supreme Court has continued to deny writs on this interpretation in cases such as Hano, Kott, and Laue. However, and properly, the Third Circuit paved its own course and the Louisiana Supreme Court agreed in a principled opinion that was rendered on February 1, 2025. *See, State v. Bartie,* 2024-00897 (La. 2/1/25), 400 So. 3d 896. The State's request for a rehearing was denied. *State v. Bartie*, 2024-00897 (La. 3/20/25), 403 So. 3d 598.

Prior to *Bartie*, people like Hano, Kott, and Laue were convicted of second degree

murder in multi-toxicity cases when one of the drugs in a multi-toxicity case was considered a contributing factor of the death. *Hano's* insidious adoption of an inapposite case, *Jones*, has allowed the "direct cause of death" to be skewed into a variety of possibilities of death, which is strictly prohibited under the law regarding reasonable doubt, due process, and meaning of direct cause.

In *Hano*, you have a woman sentenced to life in a multi-toxicity case when she only distributed methadone and the victim died from a combination of drugs, some of which were not tested because the State, relying on the contributing cause reasoning, did not need to prove anything else.

In *Kott*, you have a man sentenced to life in a multi-toxicity cases when he only arguably distributed hydromorphone (Dilaudid) and the victim's death was determined to be polysubstance drug toxicity of Hydromorphone (Dilaudid), Soma, & Xanax.

In *Laue*, you have a man sentenced to life in a multi-toxicity case when he arguably distributed heroin and the victim had a toxicology report showing heroin, morphine, salycic acid, marijuana, codeine, hydromorphone (Dilaudid), and THC at death.

In *Bartie*, you have a man sentenced to life in a multi-toxicity case when he distributed methamphetamine and the victim had a toxicology report showing morphine (either heroin or codeine), fentanyl, Xanax, methamphetamine, and amphetamine at death.

For each of these defendants, the State has been allowed to elicit medical evidence from experts who testify that one of the various drugs in a multi-toxicity case was sufficiently lethal by itself to be a direct cause of death despite other drugs that were also sufficiently lethal by itself to be a direct cause of death. That is no longer the prevailing interpretation of this State after a careful reading of *Bartie*.

Bartie's second degree murder was recently overturned by the Third Circuit, which was affirmed by Louisiana Supreme Court opinion because of its new interpretation on what is and what is not a direct cause of death in a multi-toxicity drug-induced homicide case. No longer can a lethal level of a drug in a multi-toxicity case convict a person for life when there are other lethal levels of drugs for which the defendant did not distribute.

A direct cause of death being "multi-toxicity overdose" or "poly-substance toxicity overdose" is just that. It—the **multiplicity**—is the direct cause. It is the **cocktail**, or **combination** of various depressants, stimulants, relaxants, that when mixed together in

varying quantities, become the direct cause of death. A contributing cause analysis misses this very significant point, and allows for the State to punish someone for conduct that is not attributable to him. It allows the State to pick a drug that a person distributed, when the direct cause of death was the combination of 5 drugs, or 10 drugs, or 20 drugs. However, it is the **cocktail of drugs** causing the death—not one alone—even if an expert can articulate it. And this is simply because there is a meaning behind a multi-toxicity cause. Anything otherwise allows a defendant to receive a life sentence for drugs that he did not distribute.

This reasoning is sound, and can be illustrated by analogy: A gumbo is a great combination of ingredients. Notwithstanding particular preferences, it will likely have flour, oil, filé, onions, bell pepper, okra, smoked sausage, andouille, chicken, shrimp, crabs, duck, etc. One can argue that the andouille, alone, gives gumbo its distinct taste and possibly be right about it being the direct cause of the taste. But more likely, and more soundly, gumbo tastes like gumbo because of the **combination** of ingredients. If an andouille distributor was on trial for the direct cause of gumbo taste, a jury's finding of anduoille being the direct cause would never survive appellate scrutiny because there would be reasonable doubt in light of the smoked sausages (or okras, or filés or pick one) strong presence also in the taste.[17] This would hold true even if expert witness, New Orleans Culinary Extraordinaire Emeril Lagasse, would opine that the andouille alone was sufficient in strength to cause the distinctive gumbo flavor. If you remove the andouille (or filé), you would still have that distinct gumbo flavor. And that is because, the direct cause of gumbo taste is the concoction of multiple ingredients.

This is sound and principled reasoning that easily carries over to a multi-toxicity overdose cause of death. The concoction of multiple drugs is the direct cause of death. Not one alone. The flawed reasoning of *Hano's* adoption of *Jones's* "sole" cause and "contributing factor" is no longer acceptable under a careful *Bartie* interpretation.

Laue respectfully states that after careful reading and analyzing *Bartie*, in light of previous precedent, that this Court agree that *Bartie* is an appellate court ruling that establishes a theretofore unknown interpretation of constitutional law.

## V. LAUE'S POST CONVICTION RELIEF IS TIMELY UNDER 930.8

In order for a petitioner to file a post conviction relief application after the passage of two years of the conviction becoming final, he or she must meet one of the six enumerated

---

17 Now under *Hano* it would survive appellate scrutiny because it's easy and reasonable to conclude that andouille is not the sole cause of a gumbo's taste, but certainly a contributing cause of a gumbo's taste. An easy (lazy) standard cannot stand reasonable doubt scrutiny especially when a man's liberty for the rest of his life is taken.

exceptions. This petition is focusing on the second exception found at La. C. Cr .P. art. 930.8 (A)(2), which reads:

> The claim asserted in the petition is based upon a final ruling of an appellate court establishing a theretofore unknown interpretation of constitutional law and petitioner establishes that this interpretation is retroactively applicable to his case, and the petition is filed within one year of the finality of such ruling.

In sum, Laue must prove four things as it relates to *State v. West,* and *State v. Bartie* in order to meet this exception:

1. A final ruling of appellate court;
2. Establishing a theretofore unknown interpretation of constitutional law;
3. Retroactively applicable to his case; and,
4. Petition is filed within one year of finality.

The new interpretations are handled above in sections so designated. The finality, retroactivity, and timeliness of filing are set forth below.

**A.     An Exception to the Time Limitations Under La. C. Cr. P. art. 930.8 Applies.**

The Louisiana Criminal Code of Procedure sets forth the time limitations upon which a post conviction relief petition may be filed. Generally, an applicant is afforded two years from the date the judgment of conviction and sentence become final. An exception to the two year rule applies when the "claim presented in the petition is based upon a final ruling of an appellate court establishing a theretofore unknown interpretation of constitutional law." See, La. C. Cr. P. art. 930.8(A)(2). The petitioner must also establish that this interpretation is retroactively applicable to his case. *Id.* Lastly, the petitioner must file his petition within one year of the finality of the ruling. *Id.*

**B.     The Larry West case and Deon Ray Bartie case are both final.**

In each of the cases, the Louisiana Supreme Court has ruled. Both were subject to appellate court treatment. Both were subsequently addressed by the Louisiana Supreme Court. To petitioner's knowledge, there are no pending applications for rehearing in the Louisiana Supreme Court that has not already been adjudicated. Thus, Petitioner states that the Larry West came became final on January 28, 2025. See, *State v. West*, 2024-0133 (La. 1/28/25), 399 So. 3d 405 (Mem). The Deon Ray Bartie case became final on February 1, 2025. *See, State v. Bartie,* 2024-00897 (La. 2/1/25), 400 So. 3d 896

**C.     This Petition is filed within one year of the the cases' finality.**

This petition is being filed on July 25, 2025, which is 178 days from the the earliest of

the two final decisions.

D.  **The *West* and *Bartie* cases are retroactively applicable to this case.**

    1.    **The Legislature Would Have Made an Automatic Bar Against Retroactivity if it Desired; Instead, 930.8 Asks for a Petitioner to Show Retroactivity.**

If there were a complete bar to theretofore unknown interpretations, the law under 930.8 would proscribe it outright. The Legislature has been very clear about what is and what is not retroactive to many criminal (and civil) litigants dismay. In this situation, the Legislature does not prevent retroactive application. And instead, it requests a petitioner to show that it is retroactively applied. Because the black letter does not prohibit it, and there are no precise state cases on point, a look to the Federal rules on retroactivity is appropriate.

    2.    **Under Federal Rules, a New Law is Applied Retroactively when the New Law is Substantive in Nature. It is applied prospectively, when the New Law is Procedural in nature.**

For retroactivity purposes, a rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punished. *Schirro v. Summerlin*, 542 U.S. 348 (2004). Generally, substantive rules are those that narrow the scope of a criminal statute by interpreting its terms and place particular conduct or persons covered by the statute beyond the state's power to punish. *Schirro v. Summerlin*, 542 U.S. 348, 351-52 (2004). These types of rules apply retroactively because "they necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose upon him." *Id*. at 352.

New rules of procedure, on the other hand, generally do not apply retroactively. "They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise." *Id*. at 352. Because of this tenuous connection to innocence, the Court has given retroactive affect to "only a small set of watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Id*.

The intermingling between the Sixth Amendment (arguably both substantive and procedural, and certainly watershed) and Fourteenth Amendment handling of an actual criminal law's elements (purely substantive law) requires retroactive application.

### 3. Laue's Case is of Recent Origin.

Laue's conviction became final in 2019. His first post conviction was recently concluded in 2024. These new interpretations barely missed him. Laue's case is still fresh and new. Witness's are living, evidence is still available, memories are still crisp.

### 4. Retroactivity Would Not Burden The System Or Open The Flood Gates.

Using the Louisiana Supreme Court's learned reasoning that controlled their decision in *State v. Reddick*, applying these new interpretations to Laue would not be a burden on the criminal justice system and society. (Petitioner wants to emphasize that these new interpretations are not like *Reddick's* purely procedural laws affecting jury unanimity.) There are, at most, four defendants that this new interpretation would affect as opposed to the 1,600+ that the State in *Reddick* believed would cripple the criminal justice system, and burden taxpaying society.

## VI. MR. LAUE'S CLAIM MUST BE CONSIDERED ON THE MERITS

This court, nor any other court, has had the opportunity to consider the new interpretation or consider the effect this new interpretation would have on this case as a whole. Mr. Laue submits that these new interpretations would alter the projection and outcome of the jury verdict, or quite frankly, may not have been brought at all. This Court should review the merits of the claims submitted in this application.

## VII. MR. LAUE WAS CONVICTED IN VIOLATION OF THE CONSTITUTION

Laue's conviction was obtained by skirting the Sixth Amendment, and the Fourteenth Amendment. Had these interpretations been available, it would have produced a different outcome. This radical violation of the Constitution was not harmless error. Indeed, the Louisiana Supreme Court, on rehearing, doubled back to reissue it's opinion and withdraw it's harmless error ruling regarding the surrogate testimony of Dr. Defatta.

Moreover, the *West* case's new interpretation is weightier in Laue's case. As initially observed in the first *West* decision, the Louisiana Supreme Court believed the confrontation clause issue was harmless error because the *West* case hinged on defendant identification. In *West*, there was no question about the "cause of death," which was a gunshot wound. Thus the surrogate coroner testimony prohibition was not as largely implicated in *West*. Here, the coroner testimony means everything in a case controlled by "direct cause of death" element.

The Sixth Amendment interpretation from *West*, combined with the Fourteenth

Amendment interpretation from *Bartie*, make this case ripe for consideration and reversal.

## VIII. CONCLUSION

For the reasons set forth, Mr. Laue requests:

1. That the State be ordered to file a response to the claims contained in this petition in accordance with La. C. Cr. P. art. 927(A);
2. That he be granted orders for discovery of any exculpatory information in the State's possession;
3. That if the State has any procedural objections that create questions of fact, an evidentiary hearing be held pursuant to La. C. Cr. P. art. 930;
4. That if the State makes a response on the merits that creates questions of fact, an evidentiary hearing be held pursuant to La. C. Cr. P. art. 930;
5. That he be granted leave to amend and supplement his claims for relief as necessary;
6. That he be granted relief from his conviction and sentence pursuant to La. C. Cr. P. art. 930.3 (1);
7. That he be appointed an attorney for conducting an evidentiary hearing, taking the testimony of Dr. Yoshi Kikuchi, toxicologist John Lizzaraga, and crime scene technician Jeannie Kaufman, and other matters subject to this petition; and,
8. That he be granted such other relief as equity and justice require.

RESPECTFULLY SUBMITTED:

JOSEPH X. LAUE #520423
Elayn Hunt Correctional Center
6925 Highway 74
St. Gabriel, Louisiana 70776

### AFFIDAVIT/CERTIFICATE OF SERVICE

I hereby certify that the allegations in the foregoing are true and correct to the best of my knowledge, information, and belief.

I further certify that a copy of the above and foregoing has been served on:

Melissa R. Henry
Clerk of Court, 22nd JDC
701 N. Columbia Street
Covington, LA 70433
St. Tammany Parish District Attorney

Matthew Caplan, A.D.A.
St. Tammany Parish
701 N Columbia Street
Covington, LA 70433

Elizabeth Murrill
Attorney General of Louisiana
1885 North 3rd Street
Baton Rouge, LA 70804-9005

by placing a copy of same in a properly addressed envelope in the United States Mailbox located in the Unit 2 Security Office along with a Withdrawal Slip for the costs of postage in accordance with the institution's rules and procedures for legal mail.

This 25TH day of July, 2025.

JOSEPH V. LAUE #520423